1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF OREGON

9                           PORTLAND DIVISION

10

11   **RICK WOLF,**

12            Plaintiff,              Case No. CV 09-422-HU

13        v.
                                      **FINDINGS AND**
14   **MICHAEL J. ASTRUE,** Commissioner    **RECOMMENDATION**
     of Social Security,

15

16            Defendant.

17

     David B. Lowry
18   9900 S.W. Greenburg Road, Suite 130
     Portland, Oregon 97223
19        Attorney for plaintiff

20   Dwight Holton
     Acting United States Attorney
21   District of Oregon
     Adrian L. Brown
22   Assistant United States Attorney
     1000 S.W. Third Avenue, Suite 600
23   Portland, Oregon 97204
     David Morado
24   Special Assistant United States Attorney
     Social Security Administration
25   701 Fifth Avenue, Suite 2900 M/S 901
     Seattle, Washington 98104
26        Attorneys for defendant

27

28   Findings and Recommendation Page 1

1    HUBEL, Magistrate Judge:

2        Rick Wolf brings this action pursuant to Section 205(g) of the

3    Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain

4    judicial review of a final decision of the Commissioner of the

5    Social Security Administration (Commissioner) denying his

6    application for Supplemental Security Income (SSI) benefits under

7    Title XVI of the Social Security Act.

8                        **Procedural Background**

9        Mr. Wolf filed an application for benefits on December 15,

10   2003, with an alleged onset date of June 15, 1987. The application

11   was denied initially and on reconsideration. On December 13, 2004,

12   Mr. Wolf requested a hearing before an Administrative Law Judge

13   (ALJ). The hearing was scheduled for February 6, 2007, before ALJ

14   Ralph Jones. Mr. Wolf did not appear and ALJ Jones issued an order

15   dismissing the hearing request on February 22, 2008. Mr. Wolf

16   secured new counsel and again requested review; on February 1,

17   2008, the Appeals Council sent the case back to the ALJ for another

18   hearing, finding that Mr. Wolf had given notice that he would not

19   be able to appear, and that plaintiff's former counsel had

20   withdrawn and apparently not provided plaintiff with the hearing

21   notice.

22       On June 2, 2008, a hearing was held before ALJ Riley J.

23   Atkins. On August 14, 2008, the ALJ issued a decision finding Mr.

24   Wolf not disabled. On February 2, 2009, the Appeals Council denied

25   Mr. Wolf's request for review, making the ALJ's decision the final

26   decision by the Commissioner.

27

28   Findings and Recommendation Page 2

Mr. Wolf was born in 1959, and was 49 years old at the time of the ALJ's decision. He attended college, but does not have a degree. He was incarcerated from 1980 to 1997, and again after release for 10 to 11 months. He has worked as a telemarketer, day laborer, and furniture salesman. He alleges disability on the basis of joint pain, gastro-esophageal reflux disease (GERD), carpal tunnel syndrome, chronic obstructive pulmonary disease (COPD), malabsorption syndrome, hepatitis C, depression, anxiety, adjustment disorder, personality disorder, alcohol dependence and polysubstance abuse, and attention deficit disorder.

## Medical Evidence

### Musculoskeletal

In February 2001, Mr. Wolf was diagnosed with a left medial meniscal tear that was not considered severe enough to warrant surgery. Tr. 732, 741, 344. In August 2005, he sustained a left lateral tibial plateau fracture. Tr. 676, 732. X-rays taken on March 13, 2006 showed that the fracture was healed, but that there was some minimal degenerative joint disease. Tr. 743.

On October 3, 2003, a lumbar spine series showed a moderately severe compression fracture at the L1 level. Tr. 261. The age of the fracture could not be determined. Id. Vertebral segments were well aligned and remaining vertebral bodies exhibited normal height. Disk space appeared to be average throughout the lumbar region. Id. Alignment was normal, and the pedicles and posterior elements were intact. Mild facet sclerosis was noted in the lower spine. Id. Musculoskeletal examination on October 14, 2003, by

Findings and Recommendation Page 3

Hayes, M.D., was normal in all respects. Tr. 269.

According to a VA chart note dated March 13, 2006, Mr. Wolf was on oxycodone for spinal pain, but was discontinued "due to multiple positive drug screens." Tr. 743. X-rays taken on March 13, 2006, showed mild degenerative changes in the lumbar spine and left femur, as well as moderately severe osteopenia of the lumbar spine and left femur. Tr. 675.

Gastrointestinal

Mr. Wolf has been diagnosed with irritable bowel syndrome (IBS) and possible malabsorption syndrome. Tr. 362, 364, 424, 897, 992, 999. However, a chart note dated April 25, 2001 stated that Mr. Wolf was "thought [in 1990] to have malabsorption and he was started on pancreatic enzymes," but that malabsorption was "currently in doubt." Tr. 332. According to a chart note dated August 11, 2001, the IBS was asymptomatic. Tr. 253. A chart note dated February 4, 2004, characterizes the malabsorption syndrome as "questionable," and states that no records were available. Tr. 312. A chart note dated March 13, 2006, states, again, that there is no documentation suggesting malabsorption. Tr. 743. He was diagnosed with hepatitis C at some time in the past, tr. 344, but on September 30, 2003, Dr. Hayes noted that Mr. Wolf's liver enzymes were not elevated. Tr. 269.

Neuropsychological

On June 28, 2002, Mr. Wolf was given a comprehensive neuropsychological examination by Donald Lange, Ph.D. Tr. 231. Mr. Wolf told Dr. Lange he rarely used alcohol, but occasionally used

drugs such as marijuana. Id. He said he had been approved for medical marijuana, but had not paid to get the certificate. Id. Dr. Lange noted a "history of no shows for appointments, noncompliance, and insistent drug seeking behavior for narcotics and psychostimulants such as Cylert or Ritalin." Id.

Mr. Wolf said that in 1979, he began to serve a 20-year sentence for assault, burglary and theft. Tr. 232. He was released in 1999. Id.

Asked about his disabilities, Mr. Wolf reported that he had broken his back three times, from L-1 to L-5, and that he had six bulging discs. Id. He said, without further explanation, "I've lost about 75 percent of it." Id. He said he and his doctors were deciding whether to do surgery on his left knee. Mr. Wolf said he was diagnosed with hyperactivity in 1967, and "[w]e went through a battery of meds," with the one that seemed to work the best being Cylert. Id. He cited other medical problems, including irritable bowel syndrome, chronic cough, malabsorption with a history of cholecystectomy, a sleep disorder, and a learning disability. Id. He also reported a 70 percent loss of hearing in his left ear, and hepatitis C. Id.

Testing revealed a "somewhat variable but generally average to higher range of performance on most cognitive and intellectual tasks." Tr. 233. His full scale IQ of 112 was high average, as was his verbal IQ. Id. Significant strengths were noted in cognitive and intellectual functioning, with particular strengths in visual reasoning and construction tasks. Tr. 237. However, Dr. Lange noted

Findings and Recommendation Page 5

that he "obviously has an Attention Deficit/Hyperactivity Disorder," as well as problems with mental control, mental efficiency and processing. Id. Overall, however, he was a "very intelligent gentleman and his higher cognitive functioning, including levels of verbal abstraction and reasoning were well in the high average to superior range." Id. He could be "very on or off" with respect to attention, concentration and freedom from distraction, sometimes easily distracted with difficulty sustaining prolonged focus, and other times "hyper-focused," with difficulty pulling away from stimuli. Id. The most notable aspects of his problem were expressed behaviorally; he was hyperkinetic and tended to speak rapidly with a chaotic quality to his presentation. Id.

On behavioral inventories and clinical interview he reported at least a borderline to mild level of depressive symptoms. Tr. 238. Dr. Lange noted that he had a "history of impulsivity and obvious poor choices." Although Mr. Wolf said he only occasionally used alcohol and other drugs, his medical records indicated a history of alcohol and cocaine dependence. Id. His medical records also suggested a history of drug seeking, including psychostimulants as well as narcotics. Id. Dr.Lange thought he had a high level of somatic focus "due to his complex set of multiple medical problems," and that he presented with a mixed personality disorder with characterological features that were passive aggressive, depressive and dependent. The most prominent trait was that he was self-defeating. Id.

///

Findings and Recommendation Page 6

1    Dr. Lange thought Mr. Wolf's "complex mix of multiple medical
2    problems ... and psychological factors" combined to limit his
3    ability to engage in anything other than light physical duty.
4    However, he thought "one should also expect that at various times
5    his somatic problems would undermine even sedentary work." Tr. 239.

6    His ADHD caused him to experience significant inconsistency in
7    sustained attention and concentration and the ability to maintain
8    freedom from distraction. Id.

9    His current memory functioning was in the average to higher
10    range, but his immediate memory span varied considerably. No
11    difficulty was noted with fine motor coordination, although
12    psychomotor speed was slightly slowed compared to his other overall
13    abilities. Id.

14    Dr. Lange concluded that Mr. Wolf's generally high level of
15    cognitive and intellectual abilities indicated that he could handle
16    an academic program to upgrade his computer and AutoCAD skills, but
17    school or training situations would require accommodations to his
18    ADHD, including more time on tests, optimum levels of stimulus
19    change on the job or at school, and mini-breaks to prevent hyper-
20    focus and fatigue. Tr. 241.

21    Pulmonary

22    On February 4, 2004, according to a VA chart note, after
23    inhaling a bronchodilator, Mr. Wolf's overall ventilatory function
24    was normal. Tr. 309. An EKG was also normal. Tr. 314. On April 26,
25    2004, Mr. Wolf had a cardiac workup after complaints of chest pain.
26    Tr. 330. Ramp protocol ECG stress test was normal; ECGs obtained in

27

28    Findings and Recommendation Page 7

the supine and standing positions were normal. Id. ; tr. 303. An earlier chart note, dated February 3, 2004, indicated that there was no evidence of acute cardiopulmonary disease. Tr. 312.

Polysubstance abuse

Analgesic narcotics

VA records indicate that Mr. Wolf was not prescribed narcotics because of multiple positive drug screens. Tr. 744 (cocaine 9/01, 4/01, 12/03; methadone 4/01). On July 2, 2001, Mr. Wolf reported to the VA that he had left all his medications on the bus and wanted a refill of all his medications. Tr. 333. On April 1, 2004, Mr. Wolf presented at the pharmacy window at the VA claiming that he had not received his medications. The pharmacy confirmed that it was sent via certified mail and signed for by his significant other. Tr. 302. The note states: "No early refills of any of his meds." Id. According to a June 7, 2004 chart note from the Veterans Administration (VA), VA doctors refused to prescribe pain medication to Mr. Wolf since he had been flagged as a "drug seeking client." Tr. 301. On June 8, 2004, Mr. Wolf dropped a urinalysis collection bottle into the toilet; asked to supply another sample, he did so, but later called and left a message that he had forgotten to say he was on Vicodin, prescribed by a non-VA doctor, so that his urine would likely test positive for opiates. Id. On August 5, 2004, Mr. Wolf came to the VA saying he had been mugged and his medications stolen. Tr. 326. He asked for refills, but was not successful. Id.

On June 23, 2005, Mr. Wolf's Drug Seeking Behavior (DSB)

Findings and Recommendation Page 8

status was reviewed, to determine whether behaviors had changed to warrant continuation or rescission. Tr. 750. The committee's notes state:

> Mr. Wolf's behavior that resulted in his original DSB flag included history of multiple ER visits for narcotics and pemoline, deceptive behavior to obtain these medications, angry and abusive behavior when meds denied, and poor compliance. Since the first review, records indicate that he continues to make ER visits for pain related issues, substance use (cocaine 10/04), claim of meds being stolen (12/04) and poor attendance at clinic appointments. ... His last visit was in December 2004. He has not seen primary care physician since early 2004. ...

Tr. 750. The committee found that Mr. Wolf continued to exhibit behaviors consistent with the DSB criteria and active substance use, and that his DSB status should continue. Id.

On January 20, 2004, a chart note from Dr. Hayes stated that Mr. Wolf had failed to follow through on a recommended neurologic evaluation and acupuncture treatment for back pain, and had tested positive for marijuana. Tr. 266.

On November 19, 2004, Mr. Wolf was seen at the VA for complaints of facial pain, headache and episodes of memory loss secondary to a fall one month earlier in which he fractured the orbit and facial bones on the left side. Tr. 712, 714. He "became insistent that he required narcotic analgesics to manage the pain." Tr. 714. Surgery was scheduled, but then cancelled due to positive drug screening for cocaine and marijuana. Id.; 727. An EEG was normal, awake and asleep. Tr. 713.

### Alcohol and tobacco

On August 8, 2003, Mr. Wolf was seen in the emergency room after being injured in an altercation with a neighbor. Tr. 243. The

Findings and Recommendation Page 9

examiner noted that he "smelled of alcohol," although Mr. Wolf denied a history of alcohol withdrawal symptoms. Id.

A May 3, 2006, chart note indicates that Mr. Wolf was discharged from the VA's smoking cessation program after he failed to show up for appointments or respond to messages. Tr. 725.

Functional capacity assessments

On March 18, 2004, Bill Hennings, Ph.D., completed a records review that was affirmed by Robert Henry, Ph.D. Tr. 279. In his opinion, Mr. Wolf had mild restrictions in his ADLs and in maintaining social functioning, but moderate difficulty in maintaining concentration, persistence or pace. Tr. 289.

On March 23, 2004, Linda Jensen, M.D., and Sharon Eder, M.D. completed a physical functional capacity assessment on behalf of the Commissioner. Tr. 294-98. They opined that Mr. Wolf could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk about six hours in an eight hour workday; and sit about six hours in an eight hour work day. Id. They found no postural, manipulative, visual communicative, or environmental limitations. Id. A note dated April 5, 2004, from a vocational counselor states, "Work therapy not be an option given vet's stated preference for a disability pension." Tr. 321.

**Hearing Testimony**

Mr. Wolf testified that he is dyslexic, which causes him to invert words and read very slowly. Tr. 1331-32. He said he had to read things two or three times. Tr. 1332. He wears hearing aids in both ears, but is able to hear with them. Tr. 1333. He uses a

Findings and Recommendation Page 10

walker. Tr. 1336. He wears a brace on his leg and on his back. Tr. 1338, 1349. He is in constant pain with his lower back, characterizing the pain as a seven or eight on a 10-point scale. Tr. 1338, 1341. He said his doctor had told him his bones were so brittle that he could step off the sidewalk and break his ankle, or slap his hand on top of a desk and break his wrist. Tr. 1339. He does not drive because his license was suspended for lack of insurance. He got around on a bicycle until the previous year, when his bicycle disappeared. Tr. 1339.

Mr. Wolf testified that the VA would not prescribe pain medication for him, and had not told him the reason. Tr. 1341. However, he said even Vicodin never took his pain away; "it just made it easier." Tr. 1344. Mr. Wolf testified that he is unable to lift a water pitcher, and can hardly move a gallon of milk from the refrigerator to a counter. Tr. 1345-46. He has spasms in his back and legs, as well as restless leg syndrome. Tr. 1346. His hips are "real bad," so that lying on his side "hurts so bad it wakes me up." Tr. 1347. His left leg goes out from under him as a result of the fracture and the osteoporosis, as well as "all the tears and blow outs." Tr. 1347.

Mr. Wolf rated his left leg pain as about a five or six on a 10-point scale. His leg also swells and turns purple. Tr. 1349. He avoids stairs whenever possible. Tr. 1350. He can stand about 10 minutes without needing to sit down. Id.

Mr. Wolf testified that his doctors have talked about a knee replacement, but that they wanted him to wait until he was older.

Findings and Recommendation Page 11

1  Tr. 1352. He does get shots in his knee. Id.

2      Mr. Wolf testified that he had had surgery for hiatal hernias

3  and acid reflux disease. Tr. 1352. He breaks out in a sweat when he

4  tries to comb his hair, and his wife has to shampoo it for him. Tr.

5  1353. His shoulders hurt whenever he tries to lift his hands above

6  his head. Id. He has difficulty with buttons because of the carpal

7  tunnel in his right hand, even after surgery. Id.

8      Mr. Wolf said he uses an inhaler, but is still smoking even

9  though he is trying to quit. Tr. 1354. Mr. Wolf said that before he

10 started taking medication for IBS, he was having 15 bowel movements

11 a day, but with medication it was about five times a day. Tr. 1355.

12 Mr. Wolf said his hepatitis C and depression cause him fatigue .

13 Tr. 1358. His hyperactivity disorder makes it difficult for him to

14 sit still and he loses concentration "quite a bit," so that he has

15 to repeat things over and over. Tr. 1359. He is sick to his stomach

16 most of the time and has no desire to eat. Tr. 1360. However, on

17 questioning by the ALJ, he stated that he is about six feet tall

18 and weighs about 190 pounds. Id. He does not sleep well and he

19 described his general energy level as "very little to none." Tr.

20 1361.

21     The ALJ called vocational expert (VE) Scott Stipe. Tr. 1372.

22 He asked the VE to consider a hypothetical claimant limited to

23 unskilled work with occasional public contact at a light exertional

24 level. Tr. 1374. The VE opined that such an individual could not do

25 Mr. Wolf's prior work, but that he could perform such jobs as

26 assembler, hand packager, and marker. Tr. 1375.

27

28 Findings and Recommendation Page 12

**ALJ's Decision**

The ALJ found that Mr. Wolf had the following severe impairments: status post left medial meniscal tear; degenerative disc disease of the lumbar spine; an adjustment disorder; attention deficit/hyperactivity disorder, by history; a mixed personality disorder; alcohol dependence; and polysubstance abuse. Tr. 35. The ALJ found Mr. Wolf's other symptoms and complaints, considered singly or together, had caused transient or mild symptoms and limitations, were well controlled with treatment, or were otherwise not adequately supported in the medical evidence. These included, but were not limited to, COPD, carpal tunnel, osteoporosis, irritable bowel syndrome, GERD, hepatitis C, and status post left lateral plateau fracture. Id.

The ALJ found that the meniscal tear in 2001 had not warranted surgical intervention, and that the lateral plateau fracture in 2005 was treated conservatively with physical therapy and a home exercise program. Tr. 37. X-rays had shown that Mr. Wolf's 1999 compression fracture to the lumbar spine and the lateral plateau fracture of the left knee had responded well to treatment, but "nonetheless reflect mild degenerative changes." Id. The ALJ noted that Mr. Wolf had been diagnosed with an adjustment disorder, ADHD by history, and a mixed personality disorder, with treatment involving counseling and medication, including Seroquel, Zoloft, Ritalin, Cylert and Trazadone. Id.

The ALJ found Mr. Wolf's medically determinable impairments could reasonably be expected to produce Mr. Wolf's alleged symptoms

Findings and Recommendation Page 13

and limitations, including pain, fatigue and depression, difficulty concentrating and completing tasks, and difficulty walking, lifting, carrying, standing, sitting and moving. However, the ALJ found Mr. Wolf's statements about the intensity, persistence and limiting effects of these symptoms were not fully credible. The ALJ's stated reasons for finding Mr. Wolf not fully credible were 1) his poor work history; 2) inconsistencies in his statements about drug and alcohol abuse; 3) the fact that Mr. Wolf's physicians had discontinued prescriptions for narcotic medication due to multiple positive drug screens and noncompliance with narcotics contracts; 4) the effect of his significant criminal history on the veracity of his application and testimony; 5) his ADLs; 6) the evidence of no more than conservative and routine treatment for his complaints; and 7) lack of compliance with medical treatment, including continuing to smoke, failing to wear an "off loader brace," and missing multiple scheduled appointments. Tr. 39-40. The ALJ noted further that x-rays of the lumbar spine showed only mild degenerative changes, with no spinal or neural foraminal stenosis; that examinations showed normal range of motion in the neck and back; and that medical evidence showed good results from physical therapy and an absence of significant psychotherapy or mental health counseling, or psychiatric hospitalization. Tr. 40. The ALJ concluded that Mr. Wolf's incidents of noncompliance "suggest the claimant does not have a sincere interest in achieving medical and functional improvement." Tr. 40.

> The evidence suggests the claimant's primary obstacle to
> sustaining employment is his substance abuse. These

activities have contributed to his noncompliance with treatment. He has missed scheduled appointments and displayed "manipulative" and "aggressive" behavior in an effort to obtain additional narcotics. The record is replete with emergency room encounters in which the claimant has required treatment for injuries he sustained during incidents of binge drinking. His treating physicians have noted "the smell of alcohol" on multiple occasions. Treatment notes show a discontinuation of all narcotics based on a significant pattern of abuse. He has also tested positive for cocaine on numerous occasions and as recently as April 2008. While these facts are alarming, the claimant's declaration that he does not have a substance abuse problem is cause for concern. The claimant's physicians note symptoms of "denial," which were evident in both the claimant and his significant other's testimony.

Tr. 40.

The ALJ found the testimony of Mr. Wolf's significant other, Debra Cross, not credible. Tr. 41. He noted that she had testified alcohol had "never been a problem in [Mr. Wolf's] life." Id. He found her testimony that Mr. Wolf needed assistance with combing his hair and bathing inconsistent with Mr. Woilf's own report of ADLs. Id.

The ALJ gave "a fair amount of weight" to Dr. Lange's diagnostic findings, but little weight to his opinions about Mr. Wolf's limitations. Tr. 41. The ALJ accepted most of his diagnoses (ADHD, pain disorder, dysthymic disorder, history of polysubstance abuse and mixed personality disorder). Id. The ALJ noted that Dr. Lange identified Mr. Wolf's intelligence as within the high average range, with strong skills in verbal and nonverbal reasoning, judgment, visual construction and abstract thinking, and no significant impairment in memory functioning or ability to interact with the public, but that Dr. Lange also opined that Mr. Wolf had

Findings and Recommendation Page 15

difficulties maintaining attention and concentration and might have difficulties interacting with co-workers. Id. The ALJ found these opinions of limited utility because they were vague and did not address Mr. Wolf's significant substance history, most notably incidents which occurred after Dr. Lange's evaluation. Tr. 42. The ALJ thought it appeared that Dr. Lange had relied on Mr. Wolf's subjective complaints, not objective evidence. Id.

The ALJ found Mr. Wolf mildly restricted in activities of daily living (ADLs), because he was able to complete household chores such as washing dishes, dusting and vacuuming; ride a bicycle and use public transportation; spend time with his significant other and her grandchildren; and tend to his own personal hygiene and financial affairs. Tr. 36. The ALJ found Mr. Wolf only mildly limited in social functioning as well, able to interact appropriately with friends and family, but mildly restricted in contact with the public, in part because of his significant history of polysubstance abuse and alcohol dependence. Id. The ALJ found that Mr. Wolf was moderately limited with regard to concentration, persistence or pace, because he had difficulty concentrating and maintaining focus. Id.

On the basis of these findings, and the testimony of the VE, the ALJ concluded that Mr. Wolf could not return to his past work a telephone solicitor, construction laborer, or restaurant manager, but that he had the RFC to perform light, unskilled work with only occasional public contact, including assembler, hand packager and marker. Tr. 37, 42-43.

Findings and Recommendation Page 16

1

**Standard**

2    The court must affirm the Commissioner's decision if it is

3 based on proper legal standards and the findings are supported by

4 substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111,

5 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence

6 as a reasonable mind might accept as adequate to support a

7 conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971);

8 Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In

9 determining whether the Commissioner's findings are supported by

10 substantial evidence, the court must review the administrative

11 record as a whole, weighing both the evidence that supports and the

12 evidence that detracts from the Commissioner's conclusion. Reddick

13 v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the

14 Commissioner's decision must be upheld even if "the evidence is

15 susceptible to more than one rational interpretation." Andrews, 53

16 F.3d at 1039-40.

17    The initial burden of proving disability rests on the

18 claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d

19 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must

20 demonstrate an "inability to engage in any substantial gainful

21 activity by reason of any medically determinable physical or mental

22 impairment which ... has lasted or can be expected to last for a

23 continuous period of not less than 12 months[.]" 42 U.S.C. §

24 423(d)(1)(A).

25    A physical or mental impairment is "an impairment that results

26 from anatomical, physiological, or psychological abnormalities

27

28 Findings and Recommendation Page 17

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a

Findings and Recommendation Page 18

claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the RFC to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

**1.   Substance abuse analysis**

Mr. Wolf asserts that the ALJ erred in failing to make a proper assessment of the materiality of his substance abuse under 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J) and 20 C.F.R. § 404.1535.

The Social Security Act provides that a claimant "shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). When evidence of a claimant's drug or alcohol abuse exists, the claimant bears the burden of proving that his substance abuse is not a material contributing factor to his or her

Findings and Recommendation Page 19

1   disability. <u>Parra v. Astrue</u>, 481 F.3d 742, 744-45, 748 (9th Cir.

2   2007). To carry this burden, the claimant must offer evidence that

3   the disabling effects of the impairment or impairments would have

4   remained had the claimant stopped abusing drugs or alcohol. <u>Id.</u> at

5   748-49. Evidence that is inconclusive does not satisfy this burden.

6   <u>Id.</u> at 749.

7        Under the implementing regulations, the ALJ must conduct a

8   drug abuse and alcoholism analysis by determining which of the

9   claimant's disabling limitations would remain if the claimant

10  stopped using drugs or alcohol. See 20 C.F.R. § 404.1535(b). If the

11  remaining limitations would still be disabling, then the claimant's

12  drug addiction or alcoholism is not a contributing factor material

13  to his disability. If the remaining limitations would not be

14  disabling, then the claimant's substance abuse is material and

15  benefits must be denied. <u>Id.</u> See also <u>Parra</u>, 481 F.3d at 747.

16       Mr. Wolf asserts that the ALJ found him not disabled without

17  following the proper procedure for assessing substance abuse, as

18  articulated in <u>Bustamante v. Massanari</u>, 262 F.3d 949 (9th Cir.

19  2001). He urges the court to reverse and remand for a new hearing

20  so that his substance abuse can be addressed. But in <u>Bustamante</u>,

21  the court held that "an ALJ *should not* proceed with the analysis

22  under §§ 404.1535 or 416.935 if he has not yet found the claimant

23  to be disabled under the five-step inquiry." (Emphasis added) The

24  court added, "[A]n ALJ must *first* conduct the five-step inquiry

25  without separating out the impact of [substance abuse]. If the ALJ

26  finds that the claimant is *not disabled* under the five-step

27

28  Findings and Recommendation Page 20

inquiry, then the claimant is not entitled to benefits and *there is no need to proceed* with the analysis. ..." (Emphasis added)

The ALJ followed the procedure articulated in <u>Bustamante</u>. He conducted the five-step sequential analysis and found Mr. Wolf not disabled. Accordingly, he was not required to proceed with an analysis of whether substance abuse was a contributing factor material to the disability determination.

### 2.   Rejection of Dr. Lange's opinions

Mr. Wolf contends that the ALJ's reasons for assigning "little weight" to Dr. Lange's functional limitation opinions were insufficient, and that those opinions should be credited as true. The ALJ's reasons were that 1) Dr. Lange's findings were vague; 2) he did not address Mr. Wolf's substance abuse; 3) he did not consider Mr. Wolf's extensive ADLs; and 4) he relied on Mr. Wolf's subjective complaints.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine but do not treat; and 3) those who neither examine nor treat. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. <u>Holohan</u> 246 F.3d at 1202; 20 C.F.R. § 404.1527(d). Dr. Lange is an examining doctor. In addition, the regulations give more weight to opinions that are explained than to those that are not, <u>Holohan</u> at 1202, see also 20

Findings and Recommendation Page 21

1   C.F.R. § 404.1527(d), and to the opinions of specialists concerning

2   matters relating to their specialty over that of nonspecialists,

3   see id. and § 404.1527(d)(5).

4       I note that Dr. Lange thought Mr. Wolf was physically capable

5   of light work, tr. 239, an opinion the ALJ adopted. Dr. Lange

6   opined that Mr. Wolf's memory was "generally ... quite good and he

7   definitely can learn." Tr. 239. He also characterized Mr. Wolf as

8   intelligent, with well-developed abilities in verbal reasoning and

9   an average to high intelligence within the non-verbal domain. Tr.

10  240. Dr. Lange also opined that Mr. Wolf "can think abstractly most

11  of the time," and "can learn and appears to enjoy the challenge."

12  Id.   The ALJ's RFC assessment was more limited with respect to

13  cognitive ability than that of Dr. Lange.

14      However, credibility determinations bear on evaluations of

15  medical evidence when an ALJ is presented with conflicting medical

16  opinions   or   inconsistency   between   a   claimant's   subjective

17  complaints and his diagnosed conditions. Webb v. Barnhart, 433 F.3d

18  683, 688 (9th Cir. 2005). Thus, the ALJ may properly reject a

19  medical opinion that relies on a claimant's discredited subjective

20  complaints or its inconsistency with a claimant's daily activities.

21  Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008).

22      Mr. Wolf does not challenge the ALJ's adverse findings with

23  respect to his credibility. The ALJ's opinion cites numerous

24  references to Mr. Wolf's polysubstance abuse and his denials of

25  drug and alcohol addictions, see tr. 38-39, noncompliance with

26  treatment recommendations, tr. 39, drug seeking behavior, id.,

27

28  Findings and Recommendation Page 22

unremarkable physical examinations, tr. 40, and "conservative and routine" treatment for his complaints, id. This evidence provides support for the ALJ's conclusion that Dr. Lange's opinions were vitiated by exaggerated or incorrect statements by Mr. Wolf. For example, Mr. Wolf told Dr. Lange he had broken his back three times and had six bulging disks, when in fact he had a single compression fracture, with no evidence of stenosis and with normal range of motion. There is no medical evidence of bulging disks.

Dr. Lange accepted Mr. Wolf's claims of multiple spinal fracture, chronic pain associated with orthopedic problems, chronic cough, IBS, regional enteritis, GERD, hepatitis C, pancreatic disease and malabsorption syndrome, and a claimed history of multiple concussions at a very young age. Although the record does not support many of these illnesses and injuries, Dr. Lange accepted these claims in concluding that Mr. Wolf had a pain disorder associated with general medical condition, and in opining that Mr. Wolf had "a high level of somatic focus due to his complex set of multiple medical problems." Tr. 238.

Mr. Wolf also gave Dr. Lange inconsistent statements that were incorporated into Dr. Lange's report. For example, Mr. Wolf at one point described a good appetite and high energy, tr. 233, but also said it took "extra effort" to get started doing something, and that he tired easily, and did not have a good appetite. Tr. 235. Mr. Wolf described his moods as good, rating them as a 7 on a 10 point scale, but also endorsed depressive symptoms; Dr. Lange described him as "generally gloomy, pessimistic, overly serious,

Findings and Recommendation Page 23

quiet, passive, and preoccupied with negative events." Tr. 236. I
find no error in the ALJ's declining to adopt all of Dr. Lange's
functional opinions.

### 3.   ALJ's RFC determination

Mr. Wolf asserts that the ALJ erred in failing to include
numerous impairments in his RFC, including COPD, osteopenia,
malabsorption syndrome and IBS, pain disorder and back and leg
pain. He argues that the ALJ had a duty to order an updated
consultative examination pursuant to his duty to develop the
record.

I am unpersuaded that the ALJ erred with respect to these
impairments. The medical evidence shows that when using a
bronchodilator, Mr. Wolf's pulmonary functions are normal. Tr. 309.
Moreover, the record contains numerous references to Mr. Wolf's
noncompliance with smoking cessation. There is no medical evidence
that Mr. Wolf has been diagnosed with malabsorption syndrome, and
there are several references in the record to it as a
"questionable" diagnosis. The medical evidence is that Mr. Wolf's
IBS is controlled with medication. While Dr. Lange diagnosed a pain
disorder, he did so on the basis of statements from Mr. Wolf about
physical impairments that are not documented in the record, such as
having broken his back three times; moreover, the existence of pain
disorder cannot be ascertained in a record so replete with
references to drug seeking behavior and polysubstance abuse. There
is no indication in the record that osteopenia imposes physical
limitations in addition to those identified by the ALJ and

Findings and Recommendation Page 24

encompassed within a limitation to light work.

I recommend that the Commissioner's decision be AFFIRMED.

**Scheduling Order**

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due October 18, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due November 4, 2010. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.


Dated this 28th day of September, 2010.

                                    /s/ Dennis J. Hubel

                                    _____

                                        Dennis James Hubel
                                    United States Magistrate Judge

OPINION AND ORDER Page 25